**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**Houston Division**

| | |
|---|---|
| JANE ROE | § |
| | § |
| Plaintiff, | § |
| | § |
| | §    Case No.: |
| | §    JURY |
| v. | § |
| | § |
| CYPRESS-FAIRBANKS INDEPENDENT | § |
| SCHOOL DISTRICT | § |
| | § |
| Defendant. | § |
| | § |
| | § |
| | § |
| | § |
| | § |
| | § |
| | § |

## PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

Plaintiff, through her attorneys, submits this Complaint and states the following:

## PARTIES

1. Plaintiff Jane Roe ("Roe") is an individual who, at the time of the assault and injuries claimed herein, was a minor student enrolled in Cypress Creek High School in the Cypress-Fairbanks Independent School District.

2. Defendant Cypress-Fairbanks Independent School District ("CFISD" or "the District") is an independent school district established under the laws of the State of Texas and operating in Houston, Harris County, Texas. The District may be served with process by serving its Superintendent, Mark Henry, at 10300 Jones Road, Houston, Texas 77065.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which gives district courts original jurisdiction of all civil actions arising under the

1

Constitution, laws and treaties of the United States, and 42 U.S.C. §§ 1983 and 1988.

4.  Venue in this Court is proper under 28 U.S.C. § 1391 (b) because the events giving rise to this claim took place in this judicial district, and Defendant resides in this judicial district.

## GENERAL ALLEGATIONS

### The Legal Framework

5.  At all relevant times, CFISD received federal funding for its academic programs and activities and was subject to the requirements of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 ("Title IX").

6.  Title IX protects students from discrimination "on the basis of sex," which includes protection from sexual harassment, sexual assault, and dating violence.

7.  In Texas, the statutory definition of "Family Violence" includes dating violence. Tex. Fam. Code §71.004. In turn, "dating violence" is defined as an act committed against a victim with whom the actor has or has had a "continuing relationship of a romantic or intimate nature." Tex. Fam. Code § 71.0021.

8.  Under the Texas Penal Code, a person commits a "sexual assault" if "the person intentionally or knowingly causes the penetration of the anus or sexual organ of another person by any means, without that person's consent." Tex. Pen. Code §22.011(a)(1)(A).

9.  Texas Education Code §37.007, under the heading "EXPULSION FOR SERIOUS OFFENSES," requires that "a student shall be expelled from a school if the student, on school property or while attending a school-sponsored or school-related activity on or off school property…engages in conduct that contains the elements of the offense of aggravated assault under Section 22.02, Penal Code, sexual assault under Section 22.011, or aggravated sexual assault under Section 22.021, Penal Code." Tex. Educ. Code §

37.007(a)(2)(A).

10. Texas Education Code Section 37.001 provides that "the board of trustees of an independent school district shall … adopt a student code of conduct for the district…In addition to establishing the standards for student conduct, the student code of conduct must…outline conditions under which a student may be suspended as provided by Section 37.005 or expelled as provided by Section 37.007." Tex. Educ. Code §37.001(a)(3).

11. Texas Education Code Section 37.0831 requires each school district in Texas to adopt and implement a dating violence policy and to include that policy in its district improvement plan. The policy must include the following: a definition of dating violence consistent with the Texas Family Code, (2) sections on safety planning, (3) enforcement of protective orders, (4) school-based alternatives to protective orders, (5) training for teachers and administrators, (6) counseling for affected students, (7) awareness education for students and parents/guardians.

**The Department of Education and the Office for Civil Rights**

12. The Office for Civil Rights ("OCR"), a division of the United States Department of Education ("DOE"), is responsible for the implementation, interpretation, and enforcement of Title IX.

13. The DOE was authorized by Congress, pursuant to 20 U.S.C.A. § 1682, to promulgate regulations to govern the implementation, interpretation and enforcement of Title IX.

14. OCR has promulgated numerous documents outlining the requirements for an educational institution to be in compliance with Title IX, including the January 2001 Revised Sexual Harassment Guidance: Harassment of Students By School Employees, Other Students, or

Thirds Parties (2001 Guidance) and Dear Colleague Letter of April 4, 2011 ("DCL"), which specifically concerns peer-on-peer sexual harassment and sexual assault.

15. The DCL is a "significant guidance document," intended to provide educational institutions with clarity as to the requirements they must follow to comply with the DOE. Pursuant to 72 Fed. Reg. 3432, a "guidance document" is "an agency statement of general applicability and future effect, other than a regulatory action…that sets forth a policy on a statutory, regulatory, or technical issue or an interpretation of a statutory or regulatory issue.

16. Although the April 2011 DCL was withdrawn in September 2017, it was in effect at all times relevant to Plaintiff's claims and has been recognized as relevant in determining the reasonableness of an institution's response to claims of peer-on-peer sexual harassment and sexual assault.

17. The DCL specifically outlines the requirements that educational institutions must follow regarding peer-on-peer sexual harassment and assault.

18. The DCL also requires that school "employees are trained so that they know to report harassment to appropriate school officials, and so that employees with the authority to address harassment know how to respond properly."

19. Further, the DCL states that a law enforcement investigation does not relieve the school of its independent Title IX obligation to investigate a claim of assault.

20. According to the 2001 Guidance, "[o]nce a school has notice of possible sexual harassment of students — whether carried out by employees, other students, or third parties — it should take immediate and appropriate steps to investigate or otherwise determine what occurred and take prompt and effective steps reasonably calculated to end

any harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again. These steps are the school's responsibility whether or not the student who was harassed makes a complaint or otherwise asks the school to take action.

21. The DCL requires the school to "tell the complainant that Title IX prohibits retaliation, and that school officials will not only take steps to prevent retaliation but also strong responsive action if it occurs."

22. In addition to resolving complaints promptly, the DCL also addresses OCR recommendations regarding the use of preventive education programs and comprehensive victim services.

23. The DCL also outlines OCR recommendations regarding complainant safety. The DCL states, "Title IX requires a school take steps to protect the complainant as necessary, including taking interim steps before the final outcome of the investigation. The school should take these steps promptly once it has notice of a sexual harassment or violence allegation." The DCL continues, "When taking steps to separate the complainant and alleged perpetrator, a school should minimize the burden on the complainant, and thus should not, as a matter of course, remove complainants from classes or housing while allowing alleged perpetrators to remain."

24. The DCL specifically addresses retaliation, stating, "Schools should be aware that complaints of sexual harassment or violence may be followed by retaliation by the alleged perpetrator or his or her associates. For instance, friends of the alleged perpetrator may subject the complainant to name-calling and taunting. As part of their Title IX obligations, schools must have policies and procedures in place to protect against

retaliatory harassment."

### CFISD Code of Conduct, Policies and Regulations

25. CFISD's 2013-2014 Discipline Management Plan and Student Code of Conduct identified conduct containing the elements of the offense of sexual assault under Section 22.011, Texas Penal Code as a "Level V act of misconduct" for which expulsion to a Juvenile Justice Alternative Education Program was mandatory.  The 2013-2014 Code of Conduct further provided that "[u[pon completion of an expulsion, a student that engages in the conduct of sexual assault on or off school property may be required to transfer to another school."

26. CFISD's 2013-2014 Discipline Management Plan and Student Code of Conduct identified harassment and online harassment as Level III violations and provide that "[a] violation of this magnitude may result in a student being suspended and/or place in a disciplinary alternative education program (DAEP)."

27. CFISD's Board Policies FFH(LEGAL) and FFH(LOCAL) address discrimination, harassment and retaliation, including sexual assault and dating violence, and acknowledges the District's obligations to students related to investigating and responding to such prohibited conduct.

### CFISD Police Department

28. Pursuant to CFISD Board Policies CKE(LEGAL) and CKE(LOCAL), CFISD maintains its own law enforcement department, staffed by both commissioned peace officers certified by the Texas Commission on Law Enforcement (TCOLE) and civilian support personnel.

///

29. According to the District's website, the CFISD Police Department (CFPD) is "a full-service law enforcement agency open 24 hours a day 365 days a year" and CFPD officers have the authority to make arrests both on and off campus.

30. According to the District's website, CFPD's primary jurisdiction includes all the geographical territory within the contiguous boundaries of the District, as well as any property outside the District that is owned, leased, or otherwise under the control of the Board of Trustees.

31. CFISD Board Policy CKE(LOCAL) defines the primary duties of District police officers to include "protect[ing] the safety and welfare of any person engaged in the educational process within the jurisdiction of the District…"; assist[ing] in the enforcement of District policies on District property…" and "investigat[ing] violations of District policy, rules, and regulations as requested by the chief of police or Superintendent."

32. CFISD Board Policy CKE(LOCAL) includes among the police officers' secondary duties "enforcing all laws, including municipal ordinances, county ordinances, and state laws, and investigating violations of law as needed," and "coordinating and cooperating with commissioned officers of all other law enforcement agencies in the enforcement of this policy as necessary."

33. Through CFISD Board Policy CKE(LOCAL), the Board of Trustees delegates final policy making authority as it relates to the operation of police department to the CFPD chief of police: "To carry out the provisions of this policy, the police department shall compile and maintain a departmental regulations manual that describes and sets forth departmental regulations, operational procedures, and rules pertaining to the administration of police services. The chief of police shall review the manual annually

and make any appropriate revisions."

### Teen Dating Violence and Sexual Assault

34. The intimate partner/domestic violence statistics in Texas are staggering. According to the National Coalition Against Domestic Violence:

- In 2014, Texas domestic violence hotlines answered 185,373 calls.

- In 2013, there were 76,704 reported victims of abuse by current or former spouses.

- In 2012, 114 Texas women were killed by intimate partners, more than 10 percent of the national total.

- 75 percent of Texas 16 to 24-year-olds have either experienced dating violence or know another young person who has.

- Intimate partner violence accounts for 15 % of all violent crime.

- 72 percent of all murder-suicides involved an intimate partner; 94 percent of these victims are female.

- 85 percent of all domestic violence victims are women.

35. National statistics reflect the prevalence of dating violence among teens and tweens. According to studies conducted by the Center for Disease Control and Prevention, the Department of Justice and others published on the National Domestic Violence Hotline's website, www.loveisrespect.org:

- Nearly 1.5 million high school students experience physical abuse from a dating partner in a single year.

- 1 in 3 girls is a victim of physical, emotional or verbal abuse from a dating partner.

- Girls and women between the ages of 16 and 24 experience the highest rate of intimate partner violence, almost triple the national average.

- Violent behavior often begins between the ages of 12 and 18.

### The Factual Background

36. Roe met John Doe ("Perpetrator") when both were seventh graders in the same CFISD intermediate school in 2011.

37. In the eighth grade, Roe and Perpetrator became "boyfriend and girlfriend," and began a tumultuous relationship that continued off and on until 2014. Throughout the relationship, Perpetrator was controlling, emotionally and sometimes physically abusive to Roe.

38. Roe's mother tried to intervene, at times forbidding the two from seeing each other. She could not, however, control their interactions at school.

39. As the relationship developed, Roe's grades began to slip and she was disciplined at school for tardiness, truancy and "inappropriate physical contact with peer."

40. Both Roe and Perpetrator enrolled as freshman at Cypress Creek High School for the 2013-2014 school year.  The relationship grew with the added freedom of the high school campus and  Perpetrator's aggressive controlling behavior escalated. The couple argued frequently in the hallways in the presence of staff and students and Perpetrator often left large visible "hickies" on Roe's neck.

41. During the Fall 2013 and early Spring 2014 semesters, Roe and Perpetrator engaged in sexual conduct frequently on campus, including having sexual intercourse on approximately 5 or 6 occasions at Cypress Creek in the campus stairwells.

///

42. During the relevant time period, the stairwells at Cypress Creek were isolated and known by staff and CFPD officers to be locations where sexual activity occurred. There were no security cameras in the stairwells nor did school staff or CFPD officers consistently patrol the areas. Neither staff nor CFPD officers enforced the student code of conduct in these areas.

43. Roe continued to struggle academically and was frequently tardy and truant.

44. On March 4, 2014, Roe's mother met with school personnel, including assistant principals Carol Gibson and Rashad Godbolt, to address academic and behavior concerns. During this meeting, Roe's mother expressed her concern that the abusive relationship between Roe and the Perpetrator was the cause of her daughter's problems at school. Roe's mother explained that she had forbidden the two from seeing or communicating with each other and had gone as far as taking Roe's cell phone away. School personnel responded only by telling Roe to stay away from Perpetrator.

45. On or about Friday March 7, 2014, Roe informed Perpetrator that she believed she might be pregnant. At the time, Roe and Perpetrator were ages 14 years and 15 years respectively.

46. On or about March 10, 2014, the following Monday, Roe was required to stay after school for "tutorials" – a requirement imposed by school administrators during the March 4 meeting with Roe and her mother.

47. Perpetrator, who had remained at school as well, was waiting for Roe when the tutorial session was over. The two argued and, although Roe resisted, Perpetrator pulled Roe into the stairwell. Perpetrator began to engage in sexual conduct with Roe, digitally penetrating her. Then, without warning and without Roe's consent, Perpetrator suddenly

and violently forced his entire fist into Roe's vagina, lifting her off the ground.

48. Roe experienced significant pain and began bleeding profusely from her genital area. She went to the school office to call her mother, was picked up by a relative, and went home, claiming the bleeding was due to menstruation.

49. Once Roe arrived at home, she showered and fell asleep.  Approximately three hours later, Roe awoke in excruciating pain.  Roe told her mother about her pain, admitted that the bleeding was not menstrual and confided that Perpetrator had assaulted her. Roe's mother immediately took her to the hospital emergency room.

50. At the hospital, Roe's mother demanded the authorities be contacted. The hospital contacted the CFISD Police Department, as the sexual assault occurred on a CFISD campus.  The following day, Roe's mother contacted Cypress Creek Assistant Principal Carol Gibson and informed her about the sexual assault that had occurred on campus.

51. Medical records indicate a diagnosis of "Sexual Assault Child." Roe had suffered severe internal and external injuries from the assault and she underwent the first of two surgeries that evening.

52. When Roe awoke after the first surgery, during the middle of the night, CFISD Police Officers questioned Roe regarding the assault while Roe was under heavy sedation.  Roe was discharged from the hospital the following day.  This was the only time anyone associated with CFISD questioned Roe about the assault that occurred on the Cypress Creek campus.

53. A medical examination several days later revealed additional injuries. Roe underwent a second surgery and remained hospitalized until March 18, 2014. Roe spent her 15th birthday in the hospital.  Roe's surgeries were followed by weeks of outpatient wound

care. The injuries left Roe with permanent scarring and disfigurement and the long-term effect on her reproductive health is not yet known.

54. Roe and her mother discussed the sexual assault with the gynecologist who began treating her as well.

55. Several days after the assault, Roe's mother met with Ms. Gibson, as well as another CFISD administrator. Ms. Gibson admitted that the conduct by Perpetrator was clearly non-consensual acknowledging, "Who would agree to that?"

56. However, Defendant CFISD offered no accommodations or safety measures for Roe. Defendant CFISD failed to put measures in place to separate the Perpetrator from Roe. Instead, Ms. Gibson told Roe's mother, "If we punish him, we have to punish her."

57. Perpetrator admitted the assault to Cypress Creek administrators. Despite the conduct being a violation of both the CFISD Student Code of Conduct and Texas law, the District took no disciplinary action against Perpetrator.

58. Upon information and belief, the sexual assault was not recorded or reported as required by the Texas Education Agency as part of the District's submission of Public Education Information Management System (PEIMS) data nor was it included in the District's response to the U.S. Department of Education's Civil Rights Data Collection.

59. Cypress Creek administrators either failed to report the on-campus sexual assault to the District's Title IX Coordinator or the Title IX Coordinator ignored the report and wholly failed to follow the procedure set out in CFISD Board Policy FFH(LOCAL).

60. CFPD likewise did not investigate. In fact, aside from briefly questioning Roe at the hospital while she was still under sedation, CFPD did nothing. Referring to the sexual assault as a "he said, she said" situation, CFPD told Roe's mother the incident would be

referred to the Harris County Sheriff's Office but made no effort to coordinate or cooperate with any investigation or follow up with Roe or her mother.

61. After the assault, CFISD offered no accommodations to Roe and took no measures to protect her from further harassment and retaliation. Roe missed days of instruction and struggled academically.  Roe failed multiple classes in the spring semester of 2014, including English and Biology.  Roe returned to Cypress Creek for summer school in June 2014 in an effort to catch up.

62. When Roe returned Cypress Creek for the 2014-15 school year the Perpetrator remained at school, with free and uninhibited access to Roe.  Roe had to see him every day, causing her great stress and emotional trauma.  Perpetrator repeatedly made threatening gestures to Roe, accusing her of trying to get him arrested.

63.  In addition to Perpetrator, Perpetrator's friends at Cypress Creek and Cypress Creek faculty also repeatedly subjected Roe to retaliatory harassment.

64. Perpetrator's proxies constantly bullied Roe, both in person at school and online through social media. They made derogatory comments about the medical procedures she had undergone.  Perpetrator had informed his friends of Roe's pregnancy, leading to them call her offensive and emotionally charged names including "baby killer." They accused her of falsely claiming Perpetrator raped her.

65. Roe's English teacher accusingly told her she had failed English the prior year (the year of the assault) due to "being a drop out."  Roe also failed to make the volleyball and softball teams despite playing on the teams the previous year.

66. Both Roe and her mother reported this ongoing harassment and retaliation by both students and teachers to Cypress Creek administrators and contacted the Harris County

Sheriff's Office (HSCO) to file a complaint related to the cyberbullying. Neither the District nor the HCSO investigated Roe's complaints nor took any other action to stop the harassment or remedy its affects.

67. On June 30, 2015, after enduring an increasingly hostile environment at Cypress Creek for an entire school year, Roe intentionally overdosed on Benadryl as she was being harassed by fellow Cypress Creek students on the social media application, Instagram. The unrelenting harassment related to the sexual assault had escalated to include posts encouraging Roe to kill herself.

68. Due to the ongoing hostile environment at Cypress Creek, Roe withdrew from CFISD and enrolled in school in Indiana where her father lived for the 2015-2016 school year.

69. However, Roe wanted to return to Houston to live with her grandparents, her mother and her younger siblings so she attempted to return to Cypress Creek in March 2016, the spring of her junior year.

70. Perpetrator was still a student at Cypress Creek, as were the other students who harassed her throughout the 2014-2015 school year following the sexual assault. After only a few weeks, Roe was overwhelmed and unable to continue attending school. When Roe's mother met with school personnel to discuss her concerns about Roe, school personnel made no effort to investigate or otherwise address her concerns nor did they provide or offer to provide any support services to Roe. Instead, Roe's mother was encouraged to simply withdraw her daughter and to designate on the withdrawal form that Roe was going to be "home schooled."

71. Roe now believes that Cypress Creek personnel were acting in the best interest of the campus and the District and with deliberate indifference to the continuing effects of the

on-campus sexual assault and retaliation she was suffering when they facilitated her withdrawal. Roe believes that the action was driven out of concern that she would likely perform poorly on upcoming state assessments and was taken to avoid having to report her to the Texas Education Agency as a drop out – both of which would have reflected negatively on Cypress Creek High School and the District.

72. On April 13, 2016, at barely 17 years old, Roe withdrew from high school during her junior year. She never returned to Cypress Creek high school – or any other high school.

73.  Roe continued to struggle physically and emotionally. She became increasingly withdrawn from her family and engaged in self-destructive behavior. Roe watched in isolation as her Cypress Creek High School peers, including Perpetrator, enjoyed all the typical senior year activities that mark the culmination of a Texas public school student's educational career – homecoming, prom, and, most importantly, graduation.

**Violations of Law and Policy**

74. Defendant CFISD's actions and inactions related to dating violence, Roe's sexual assault and subsequent harassment and retaliation violated several of its own policies.

75. Defendant CFISD's actions and inactions related to dating violence, Roe's sexual assault and subsequent harassment and retaliation violated Texas law, including but not limited to Texas Education Code Section 37.0831.

76. Defendant CFISD's actions and inactions related to dating violence, Roe's sexual assault and subsequent harassment and retaliation violated the DCL and other guidelines promulgated by the DOE.

77. Based on information and belief, Defendant failed to properly train and educate its employees, including school administrators, faculty, staff and police officers in the

prevention of and appropriate response to allegations of dating violence, sexual harassment, sexual abuse, and retaliatory conduct, as well as the implementation of mandated Title IX and dating violence policies and procedures.

78. Based on information and belief, Defendant failed to educate CFISD students, including but not limited to Roe and Perpetrator, on the dangers of dating violence, sexual harassment, assault and retaliatory conduct, including but not limited to the impact of such conduct on victims.

79. Defendant, through its administrators and police officers, acted with deliberate indifference toward dating violence, Roe's reports of sexual assault, harassment and retaliation as reflected by Defendants' actions and inaction alleged herein.

80. As a result of Defendant's actions and inaction in related to dating violence, Roe's sexual assault, and as a result of her ongoing harassment by Perpetrator and his proxies, Roe was deprived of a multitude of educational opportunities and/or benefits, including but not limited to:

    **a.** Failure of multiple classes

    **b.** A significant drop in her grades

    **c.** Being unable to participate in extra-curricular school activities, including but not limited to athletics.

    **d.** Withdrawal from school altogether.

**FIRST CAUSE OF ACTION**
**DISCRIMINATION ON THE BASIS OF GENDER**
**IN VIOLATION OF 20 U.S.C. § 1681 (TITLE IX)**

81. Plaintiff incorporates all paragraphs of this Complaint is if fully set forth herein.

82. CFISD's acts and failures to act perpetrated against Roe amounted to unlawful sexual harassment and discrimination on the basis of gender. The harassment and discrimination

16

was sufficiently severe and pervasive as to create an abusive, and sexually hostile educational environment for Roe. One or more CFISD administrators or officials, with authority to take corrective action on Roe's behalf, had actual notice of the sexual assault, harassment and discrimination and failed to adequately respond, in violation of their own policies. Those failures amounted to deliberate indifference toward the unlawful sexual conduct and retaliatory conduct that had occurred, was occurring, or was likely to occur. The District's action –and inaction – was clearly unreasonable. As a result, Roe was subject to continuing harassment and a loss of educational opportunities and benefits.

83. CFISD had actual knowledge that Roe was in an abusive relationship with Perpetrator and was a victim of dating violence prior to the on-campus sexual assault.

84. CFISD had actual knowledge of the on-campus sexual assault committed by Perpetrator against Jane Roe while both were students at Cypress Creek.

85. CFISD's acts and failures to act in response to such knowledge amounted to deliberate indifference. By acting clearly unreasonably in response to the dating violence, Jane Roe's known sexual assault and subsequent harassment by Perpetrator and his proxies, CFISD created and exacerbated a sexually hostile environment for Jane Roe on campus, thereby discriminating against her on the basis of gender.

86. As a result of CFISD's deliberate indifference, Roe was forced to endure a sexually hostile environment on campus and was made vulnerable to further harassment. After reporting her assault, she did in fact suffer further harassment and retaliation.

87. CFISD acted with deliberate indifference in deviating significantly from the standard of care outlined by the Department of Education in both the 2001 Guidance and the 2011 DCL.

88. CFISD acted with deliberate indifference by failing to comply with Chapter 37 of the Texas Education Code and in failing to enforce the District's Student of Code of Conduct and its own policies.

89. Additionally, and/or in the alternative, CFISD failed to enact and/or disseminate and/or implement proper or adequate procedures to prevent, discover, prohibit or remedy the kind of gender-based discrimination that Plaintiff suffered.  This failure included, without limitation, non-existent or inadequate customs, policies or procedures for the prevention, recognition, reporting, investigation and correction of unlawful gender-based discrimination, and/or the failure to adhere to its own policies. Those failures amounted to deliberate indifference toward the unlawful sexual conduct and retaliatory conduct that had occurred, was occurring, or was likely to occur both on campus and off campus.

90. As a result of CFISD's deliberate indifference, Plaintiff was subjected to a heightened risk that she would be a victim of dating violence and sexual assault. This risk materialized when she was assaulted on campus.

91. CFISD failed to take prompt and effective steps reasonably calculated to end the harassment, failed to eliminate and prevent the recurrence of the hostile environment Roe suffered and further failed to remedy its effects.

92. Plaintiff has incurred, and will continue to incur, attorney's fees and costs of litigation.

**SECOND CAUSE OF ACTION**
**42. U.S.C. § 1983**

**THE FOURTEENTH AMENDMENT**
**OF THE UNITED STATES CONSTITUTION**

**EQUAL PROTECTION**

93. Roe incorporates all paragraphs of this Complaint is if fully set forth herein.

18

94. By its conduct, acting under color of state law through its administrators and CFPD, CFISD is liable under 42 U.S.C. § 1983 for violating Roe's rights under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

95. One of the primary functions of law enforcement, including CFPD, is deterrence of crime. Active investigation and resolution of sexual assault and dating violence cases serve to deter past and potential offenders from perpetrating sexual assault and engaging in dating violence in the future.  By deterring crimes against female students, law enforcement protects female students from future harm.

96. CFPD had a duty to diligently investigate all crimes, including sexual assault and dating violence reported by female students. Defendant CFISD breached this duty by routinely and systematically failing and/or refusing to do so.

97. At all relevant times, CFISD, acting through its administrators and CFPD, developed, implemented, enforced, encouraged and sanctioned de facto policies, practices, and/or customs exhibiting deliberate indifference to Roe's constitutional rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution

98. CFISD had a custom, policy and practice of failing to properly record, process, and investigate reports of sexual assault and dating violence against female students based on gender and gender-stereotypes.

99. CFISD's unlawful actions were committed willfully, knowingly and with specific intent to deprive Roe of her constitutional rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

100.    The constitutional injury inflicted by CFISD was caused by a person(s) with final policy making authority.  Now-retired CFISD Chief of Police Alan Bragg established the

19

department in 2011 and was police chief during all relevant times. The Board of Trustees specifically delegated final policy making authority to the police chief in the operation of the police department. Upon information and belief, Roe alleges that Bragg knew about the above described conduct, facilitated it, condoned it, and/or turned a blind eye to it.

101.     In the alternative, CFISD's actions and inactions demonstrate a continuing, widespread and persistent pattern of constitutional misconduct that constitutes an unofficial policy, custom or practice. CFISD administrators, specifically Cypress Creek administrators and the District's designated Title IX coordinator, intentionally ignored Roe's complaints and the complaints of other female students of sexual harassment and sexual violence, including dating violence and sexual assault.

102.     CFISD's failure to properly investigate and take action on female students' reports of sexual assault and dating violence, including Roe's, emboldened and empowered male assailants, including Perpetrator, to repeat the offenses and rendered female victims, including Roe, more vulnerable to further violence and harassment.

103.     CFISD's routinely failed to provide victims of sexual assault and dating violence, including Roe, with appropriate resources and failed to inform victims, including Roe, of options for protective orders, school-based protective orders or other measures reasonably available to ensure their safety.

104.     CFISD's unlawful policies, practices and/or customs included the failure to properly hire and train staff and police officers charged with handling complaints of sexual assault and dating violence. CFISD was deliberately indifferent to Roe's rights under the Equal Protection Clause of the Fourteenth Amendment by

a.  Failing to properly hire officers and staff with the appropriate background, training and experience to respond to reports of sexual assault and dating violence.

b.  Failing to train officers and staff to appropriately respond to reports of sexual assault and dating violence, including ensuring staff and officers employed investigative methods and techniques recognized as appropriate with victims of such violence and provided appropriate safety measures to protect victims from further violence.

c.  Failing to adequately train officers and staff to prevent, recognize and appropriately respond to dating violence and reports of sexual assault including providing necessary counseling and support services.

105.    CFISD's unlawful policies, practices and/or customs included the failure to educate CFISD students, including but not limited to Roe and Perpetrator, on the dangers and consequences of dating violence, sexual harassment, assault and retaliatory conduct.

106.    Although CFISD had a "paper policy" apparently designed to comply with state and federal law, the District's actual informal customs, practices and policies reflect intentional discrimination against female students, including Roe, based on gender and gender stereotypes.

107.    As a result of CFISD's violation of Roe's constitutional right to Equal Protection, Roe is entitled to compensatory damages for emotional pain, suffering, mental anguish and other non-pecuniary losses.

///

///

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff prays for damages; punitive damages; costs; interest; statutory/civil penalties according to law; attorneys' fees and costs of litigation, pursuant to 42 U.S.C. §1988 or other applicable law; and such other relief as the court deems appropriate and just.

## PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS

Dated:  August 17, 2018                          Respectfully submitted,

*/s/ Sheila P. Haddock*
Sheila P. Haddock
Attorney-in-charge
(Texas SBN # 00790810)
(Southern Dist. of Texas # 256441)
Sheila@zalkin.com
Alexander S. Zalkin (*pro hac vice pending*)
alex@zalkin.com
Irwin M. Zalkin (*pro hac vice pending*)
irwin@zalkin.com
THE ZALKIN LAW FIRM, P.C.
12555 High Bluff Drive, Ste. 301
San Diego CA  92130
Telephone: (858) 259-3011
Facsimile: (858) 259-3015

*Attorneys for Plaintiff Jane Roe*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 17, 2018, I electronically filed the foregoing paper with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record in this matter.

THE ZALKIN LAW FIRM, P.C.

*/s/ Sheila P. Haddock*
Sheila P. Haddock
Attorney-in-charge
(Texas SBN # 00790810)
(Southern Dist. of Texas # 256441)
Sheila@zalkin.com
THE ZALKIN LAW FIRM, P.C.
12555 High Bluff Drive, Ste. 301
San Diego CA  92130
Telephone: (858) 259-3011
Facsimile: (858) 259-3015

Dated: August 17, 2018