**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**Houston Division**

| | | |
|---|---|---|
| JANE ROE | § | |
| | § | |
| Plaintiff, | § | |
| | § | Case No.:  4:18-cv-02850 |
| | § | JURY |
| v. | § | |
| | § | |
| CYPRESS-FAIRBANKS INDEPENDENT | § | |
| SCHOOL DISTRICT | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR FINAL
SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION…………………………………………………………………...1

QUESTIONS PRESENTED……………………………………………….…....1

STANDARD OF REVIEW……………………………………………………..1

SUMMARY…………………………………………………………………....2

FACTUAL BACKGROUND…………………………………………………...2

ARGUMENT & AUTHORITIES……………………………………………...12

I.      The Evidence in This Case Supports Jane Roe's Claims for Heightened
        Risk Based on Both an Official Policy of Discrimination and
        *Pre-Assault* Deliberate Indifference ……………………………...…….13

        A.      *CFISD policies, practices and failure to train staff and students created a heightened*
                *risk that Jane would be a victim of teen dating violence and suffer a sexual assault on*
                *campus.*…….……………………………………………………………………………13

        1.      "What is Title IX?"……………………………………...……….....16

        2.      Dating Violence Policy Implementation………………...………..17

        3.      No Discipline = No Report………………………………………...18

        B.      CFISD acted with deliberate indifference to the known risk of dating
                violence and sexual assault on its campuses, specifically Cypress Creek
                High School. …………………………………………………………...18

        1.      District-Wide Sexual Misconduct……………………………….....20

        2.      Sex in the Stairwells……………………………………...……21

II.     Jane's *Post-Assault* CFISD's Response to Jane's Report of Sexual
        Assault was Clearly Unreasonable……………………………...…......21

        A.      The Facts Surrounding the District's Investigation are Substantially
                Disputed……………………………………………………...……….....23

        B.      CFISD seeks to Distract the Court with Irrelevant and Undisclosed
                Evidence……………………………………………………………....24

CONCLUSION AND PRAYER…………………………………………….....25

**TABLE OF AUTHORITIES**

**CASES**

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)……………………………………………………………2

*Cannon v. Univ. Chic.,*
    441 U.S. 677,(1979)…………………………………………………………...12

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)…………………………………………………………...2

*Cf. Ruvalcaba v. Angleton Indep. Sch. Dist.,*
    No. 3:18-CV-00243, 2019 U.S. Dist.
    LEXIS 229466 (S.D. Tex. Dec. 19, 2019)………………………………………..23

*C.T v. Liberal Sch. Dist.,*
    562 F.Supp.2d 1324 (D. Kan. 2008)……………………………………………..15

*Davis v. Monroe Cty. Bd. Educ.,*
    526 U.S. 629,(1999)……………………………………………………...15, 19, 22

*Doe v. Emerson College,*
    271 F. Supp. 3d 337 (D.Mass. 2017)…………………………………………..15

*Doe v. Forest Hills Sch. Dist.,*
    No. 1:13-CV-428, 2015 U.S. LEXIS 175321, 2015
    WL 9906260,  at *17 (W.D. Mich. Mar. 31, 2015)……………………….……..16

*Doe v. Katy Indep. Sch. Dist.,*
    No. H-17-1060, 2019 U.S. LEXIS 214831, 2019
    WL 6830792 (S.D. Tex. Dec. 13, 2019)………………………………………...23

*Doe 1-10 v. Baylor Univ.,*
    240 F.Supp.3d 646, 657 (W.D. Tex. 2017)……………………………………..12

*Does 12-15, et al v. Baylor Univ.,*
    336 F. Supp. 3d 763 (W.D. Tex. 2018)………………………………………14

*Franklin v. Gwinnett Cty. Public Schs.,*
    503 U.S. 60 (1992)…………………………………………………………...12

*Gebser  v. Lago Vista Indep. Sch. Dist.,*
    524 U.S. 274, 290………………………………………………………13

*Gerdin v. CEVA Freight, L.L.C.,*
    908 F.Supp.2d 821 (S.D. Tex. 2012)…………………………………………..2

**TABLE OF AUTHORITIES**
**(Continued)**

*Gruver v. Louisiana,*
    401 F.Supp.3d 742, 762 (E.D. La. 2019)……………………………………………..….14

*Harvey v. Carthage Indep. Sch. Dist,*
    No. 2-18-CV-00164-JRG, 2019 U.S. Dist.
    LEXIS 36261, 2019 WL 1083782 (E.D. Tex. Mar. 7, 2019)………………………..….14

*Hernandez v. Baylor Univ.,*
    274 F.Supp.3d 602 (W.D. Tex. 2017)……………………………………………….13, 14

*I.F.  v. Lewisville Indep. Sch. Dist.,*
    689 F.3d 360, 369 (5th Cir. 2019)……………………………………………………....2

*In re Metro Gov't of Nashville & Davidson Cty,,*
    No. 19-0508, 2020 U.S. App. LEXIS 2331
    (6th Cir. January 24, 2020)……………………………………………………….…..20

*J.B. v. Klein Indep. Sch. Dist.,*
    No. 4:19-CV-0210, 2020 U.S. Dist. LEXIS 26737
    (S.D. Tex. Feb. 18, 2020)……………………………………………………………..22

*Karasak v. Regents of the Univ. of Cal.,*
    948 F.3d 1150 (9th Cir. 2020)………………………………………………………....15

*Little v. Liquid Air Corp.,*
    37 F. 3d 1069 (5th Cir. 1994)…………………………………………………………..1

*Mansourian v. Regents of Univ. of Cal.,*
    602 F.3d 957, 967 (9th Cir. 2010)…………………………………………………….14

*McIntosh v. Smith,*
    690 F.Supp.2d 515 (S.D. Tex. 2010)………………………………………………...2

*Prasad v. George Washington Univ.,*
    325 F.R.D. 1, (D.D.C. 2018)………………………………………………………..15

*Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.,*
    647 F.3d 156 (5th Cir. 2011)…………………………………………………....19, 22

*Simpson v. Univ. of Colorado Boulder,*
    500 F.3d 1170, (10th Cir. 2007)……………………………………………………15

## TABLE OF AUTHORITIES
### (Continued)

*T.C. ex rel S.C .v. Metro Gov't of Nashville & Davidson Cty.,*
 378 F.Supp.3d 651,  (M.D. Tenn. 2019)
  vacated on other grounds and remanded,
 *In re Metro Gov't of Nashville & Davidson Cty,*
 No. 19-0508, 2020 U.S. App. LEXIS 2331 (6th Cir. January 24, 2020)……………………20

## RULES

20 U.S.C. §1681(a)…………………………………………………………………………...12

Fed. R. Civ. P.56(c)………………………………………………………………………...1

Tex. Educ .Code §37.0831……………………………………………………………………….3

iv

**TO THE HONORABLE JUDGE OF THE COURT:**

Plaintiff Jane Roe files this Opposition to the Motion for Final Summary Judgment filed by Defendant Cypress-Fairbanks Independent School District ("CFISD" or "the District"). In support, Roe shows the Court as follows:

## INTRODUCTION

This case arises from CFISD's deliberate indifference to its duties under Title IX and systemic failure to address sexual harassment and sexual violence on its campuses. Fourteen-year-old Jane Roe's tragic experience as a victim of dating violence and sexual assault at the hands of her first boyfriend and fellow Cypress Creek High School freshman, John Doe, serves as an example of the devastating consequences that occur when a school district turns a blind eye, intent more on public perception and maintaining the appearance of Title IX compliance than ensuring its students truly enjoy the educational benefits and opportunities to which they are entitled.

## QUESTIONS PRESENTED

I.    Whether CFISD's policies, practices and failure to train students and staff to recognize, report and respond to dating violence and sexual assault created a heightened risk under Title IX that Jane Roe would be assaulted?

II.   Whether CFISD acted with deliberate indifference to the known risk of dating violence and sexual assault when it created a high school campus culture in which sexual misconduct was rampant, ignored clear warning signs and dismissed pleas from Jane Roe's mother that her daughter was in danger?

III.  Whether CFISD's actions in response to Jane Roe's report of sexual assault were clearly unreasonable in light of the known circumstances where its administrators' investigation was tantamount to no investigation at all, where its actions made her vulnerable to future harassment and where, as a result, Jane dropped out of high school?

## STANDARD OF REVIEW

A party moving for summary judgment must demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P.56(c). "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Little v. Liquid Air Corp.*, 37 F. 3d 1069,

1

1075 (5th Cir. 1994)(en banc)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). If the moving party carries its initial burden, Rule 56(c) then requires the nonmovant to go beyond the pleadings and show that specific facts exist over which there is a genuine issue for trial. *McIntosh v. Smith,* 690 F.Supp.2d 515 (S.D. Tex. 2010). A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986). In reviewing the evidence, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Gerdin v. CEVA Freight, L.L.C.*, 908 F.Supp.2d 821, 824-825 (S.D. Tex. 2012).

## SUMMARY

Jane Roe brings  pre-assault and post-assault claims against CFISD under Title IX. Genuine issues of material fact exist that must be decided by jury. First, CFISD intentionally discriminated against Jane Roe in violation of Title IX by maintaining a policy of deliberate indifference to the risks of dating violence and sexual assault. The District's failure to provide the education and training to students and staff obviously necessary to implement its statutorily required policies coupled with its distorted data recording gave rise to heightened risk that Jane would be sexually assaulted. Next, CFISD disregarded known risks of sexual assault on its campuses, including Cypress Creek High School, and ignored warning signs that Jane would become the victim of dating violence and assault. This deliberate indifference gives rise to Jane's pre-assault heightened risk claim. Finally, CFISD response to Jane's complaint of sexual assault was clearly unreasonable under the known circumstances.

## FACTUAL BACKGROUND
### Teen Dating Violence

National statistics reflect the prevalence of dating violence among teens and tweens. According to studies conducted by the Center for Disease Control and Prevention, the Department of Justice and

others published on the National Domestic Violence Hotline's website, www.loveisrespect.org:

- Nearly 1.5 million high school students experience physical abuse from a dating partner in a single year.
- 1 in 3 girls is a victim of physical, emotional or verbal abuse from a dating partner.
- Girls and women between the ages of 16 and 24 experience the highest rate of intimate partner violence, almost triple the national average.
- Violent behavior often begins between the ages of 12 and 18.

In 2007, Texas became the first state in the nation to mandate school policies addressing dating violence. Texas Education Code Section 37.0831 requires each school district in Texas to adopt and implement a dating policy and to include that policy in its district improvement plan. The policy must include the following: a definition of dating violence consistent with the Texas Family Code, (2) sections on safety planning, (3) enforcement of protective orders, (4) school-based alternatives to protective orders, (5) training for teachers and administrators, (6) counseling for affected students, (7) awareness education for students and parents/guardians. To assist school districts in meeting these statutory requirements, the Texas Dating Violence Prevention Team, a group of nonprofits and government agencies dedicated to teen dating violence awareness and prevention, created a document entitled *A Guide to Preventing Dating Violence in Texas Schools*. (Ex 24). The guide, which outlines a model policy for schools that fit the legislature's mandate was distributed to every superintendent in the state. (Ex.24).

According to *A Guide to Preventing Dating Violence in Texas Schools*, dating violence refers to any kind of abusive act in a dating relationship. It is most obvious when physical or sexual abuse is involved but teen dating violence also includes verbal abuse, threats and extreme possessiveness. (Ex.24).

**Jane Roe's Dating Relationship with John Doe**

Jane Roe met John Doe when both were seventh graders at Bleyl Middle School in CFISD in 2011. (Ex.1/3). In the eighth grade, Jane and Doe became "boyfriend and girlfriend," and began a tumultuous dating relationship. (Ex.1/4-10)(Ex.2/6) Throughout the relationship, John Doe was

controlling, emotionally and sometimes physically abusive to Jane.(Ex.1/4-10)(Ex.2/6-10). Doe alienated Jane from her friends and family. (Ex.2/8). He discouraged her from her long-time involvement in sports and did not want her to participate in other activities. (Ex.2/9). (Jane was tall for her age and a talented softball and volleyball player. (Ex.2/9)) Jane's mother tried to intervene, forbidding the two from seeing each other outside of school. (Ex.1/4-6)(Ex.2/6,12).She could not, however, control their interactions at school. As the relationship developed, Jane's grades began to slip and she was disciplined at school for tardiness, truancy and "inappropriate physical contact with peer." (Ex.1/10)(Ex.20 CFISD-ROE 001034-001035). When Jane's mother expressed concern to a Bleyl Middle School assistant principal about the relationship and told him that she did not allow Jane to see Doe outside of school, he assured her they would keep an eye on things at Bleyl. (Ex. 2/7).

## The Warning Signs

Both Jane and Doe enrolled as freshman at Cypress Creek High School for the 2013-2014 school year. (Ex.1/7) The relationship grew with the added freedom of the high school campus and Doe's possessive and controlling behavior escalated. (Ex.1/8)(Ex.2/11) The couple argued frequently in the hallways in the presence of staff and students and Doe left large visible "hickies" on Jane's neck. (Ex.1/8). They were always together at school. They met up between classes and walked together to every class. (Ex.1/8). Although he never hit or slapped Jane, Doe grabbed her arm if he thought she was looking at someone else. (Ex.1/8). If Jane wore clothing Doe thought was too revealing, he made her wear his hoodie to cover up. (Ex.1/8). Doe would hang on to Jane, refusing to let her leave to go to class until she hugged or kissed him. (Ex.1/8).

Early in the Fall 2013 semester, Jane and Doe had sexual intercourse for the first time. (Ex.1/14). Without her mother's knowledge or permission, Jane left school and went with Doe to his house where they had sex. (Ex. 1/14). This was the one and only time Jane went to Doe's house. (Ex.1/14). And this was the one and only time Jane and Doe engaged in sexual activity outside of school. (Ex.

1/15)

During the Fall 2013 and early Spring 2014 semesters, Jane and Doe engaged in sexual conduct frequently on campus, including having sexual intercourse in the campus stairwells. (Ex.1/15). The stairwells at Cypress Creek were known by staff and CFPD officers to be locations where sexual activity occurred. (Ex.9/20:1-6)(Ex.11/47:16-48:23)(Ex.14/14:14-19). There were no security cameras in the stairwells nor did school staff or CFPD officers consistently patrol the areas. (Ex. 1/12, 15). Neither staff nor CFPD officers enforced the student code of conduct in these areas. (Ex. 1/12,15).Once a teacher entered the stairwell when Jane and Doe were engaged in sexual activity. They stopped, stayed pressed close together and the teacher passed by without saying anything. (Ex.1/15). Sex in the stairwells at Cy Creek was so widely known among students that it become the school's stereotype. (Ex.1/12,13-A).

During the fall and early spring semester of Jane's freshman year, Jane's mother spoke with several people at Cypress Creek about her concerns about Jane and Doe's relationship, (Ex.2/14) Jane's mother recalls telling Cypress Creek Assistant Principal Carol Gibson[1] several times in the fall that Doe was controlling, emotionally abusive and possibly physically abusive at times." (Ex.2/14). Gibson recalls a meeting with Jane's mother and/or grandmother in December 2013 in which they expressed concerns about Jane having "academic and emotional" difficulties because of an unhealthy relationship with a boyfriend and asked, "what we could do at school." (Ex.7 25:9-26:17). Gibson responded by reminding Jane, if she saw the two of them together, that her "parents didn't want them to be together, to go to class." (Ex.7 26:18-27:4).

In late December 2013, during winter break, Jane became very upset because her mother would not let her speak with Doe. She cut herself on her arms and, concerned for her mental health, her

---

[1] Carol Gibson is now Carol Alexander.

mother took her to Cypress Creek Hospital. (Ex. 2/13)(Ex.18 HIGHLY CONFIDENTIAL JR00942). Jane denied the cutting was an act of self-harm and told doctors that she did it to make her mother feel bad for keeping her from Doe. (Ex.2/13) )(Ex.18 HIGHLY CONFIDENTIAL JR00942). Jane's mother notified Jane's softball coach, Randy Kight that she would miss practice because of the cutting incident and shared her concerns about Doe's controlling behavior. (Ex. 2/14).

Jane's grades were steadily declining. On March 4, 2014, Jane's mother met with school personnel, including assistant principals Carol Gibson and Rashad Godbolt, to address academic and behavior concerns. (Ex.2/15) Jane was present during part of the meeting. (Ex. 1/16) During this meeting, Jane's mother expressed her concern that the abusive relationship between Jane and Doe was the cause of her daughter's problems at school. (Ex. 2/16) Jane's mother explained again that she had forbidden the two from seeing or communicating with each other and during the meeting took Jane's cell phone away. (Ex.2/16). Jane's mother asked for a schedule change to ensure Jane and Doe would not have any classes together but was told that they "could not do that." (Ex. 2/17). When they denied her request, Jane's mother told them directly: "He's going to end up hurting her." Jane's mother believed that Doe would beat Jane up or otherwise physically harm her. (Ex. 2/17). The Cypress Creek staff in the meeting told Jane's mother their "hands were tied" and they could not do anything to prevent them from being around each other. (Ex. 2/17). No one made any suggestions or offered any assistance in addressing the issues with Doe. (Ex.2/17). The only outcome of the meeting was that Jane would be required to attend afterschool tutorials. (Ex. 17).

On Friday March 7, 2014, Jane and Doe were together after school waiting for the busses when Doe rubbed Jane's stomach. (Ex.1/17). He commented that her belly felt bigger and said something like "I think your pregnant." (Ex.1/17). Stunned, Jane recalls pushing his hand away and saying something like "Don't say that."(Ex.1/17).

### The Sexual Assault

On Monday, March 10, 2014, Jane and Doe met outside her 7th period class as usual and walked together down the hall at dismissal time, which was 2:30 p.m. (Ex. 1/18) As she had been instructed in the meeting the week before, Jane went to tutorials for math. (Ex. 1/18) After about 15 minutes in tutorials, Jane left. Doe was waiting for her and they went to Stairwell #2 at the end of one of the Freshman area hallways. (Ex. 1/18, 19-B) They began engaging in sexual activity and he digitally penetrated her. Suddenly, without warning or consent, he punched his entire fist inside Jane's vagina. (Ex. 1/18) Doe did it with enough force to lift 5'10" Jane off her feet. (Ex.1/18) Jane was shocked and in immense pain immediately. (Ex.1/18). Doe removed his fist and she began bleeding profusely. (Ex.1/18) They left the stairwell on second floor of the school and walked together across the campus to bathrooms on the second floor near the athletic area. (Ex.1/18.19-B). Jane removed a spandex undergarment that was soaked with blood and threw it in the trash in the bathroom. (Ex.1/18). Jane and Doe walked together to the front office area. By this time, it was about 3 p.m. (Ex.1/18). Because Jane's mother had taken her phone, she used Doe's phone to call her mother to pick her up. (Ex.1/18).

Jane's grandfather picked her up. (Ex. 4/9) Pale, bleeding and in pain, Jane sat on her binder to protect the seats in his car. (Ex.4/9)(Ex.1/20) Leading her family to believe she was just having "female issues," Jane went straight up to her room. (Ex.1/21)(Ex.2/19) At some point, Jane showered and fell asleep. (Ex.1/20) Several hours later, Jane awoke in excruciating pain.(Ex.1/20,21)  Roe told her mother about her pain, admitted that the bleeding was not menstrual and confided that Doe had assaulted her. (Ex.1/21)(Ex.2/19,20). Roe's mother immediately took her to the hospital emergency room. (Ex.1/21)(Ex.2/20).

At the hospital, Jane's mother demanded the authorities be contacted. (Ex.2/21). The hospital contacted the CFISD Police Department since the sexual assault occurred on a CFISD campus. (Ex. 2/21).

Medical records indicate a diagnosis of "Sexual Assault Child." (Ex.17/HIGHLY CONFIDENTIAL JR00743). Jane underwent a SANE (Sexual Assault Nurse Examiner) exam and her injuries were photographed. (Ex. 19). Roe suffered severe internal and external injuries from the assault and she underwent the first of two surgeries that in the early morning hours of the March 11, 2014. (Ex.1/22,23)(Ex.2/23)(Ex.3/9). While waiting for surgery, Jane learned she was five weeks pregnant. (Ex. 1/22). Jane's mother was stunned since she knew that Jane was not seeing Doe outside of school. (Ex.2/24). Struggling to understand why Doe would intentionally injure Jane in this way, something "clicked" and she believed he did it to cause her to miscarry. (Ex. 2/25).

When Jane awoke after surgery around 3 a.m., two CFISD Police Officers questioned her regarding the assault while she was under heavy sedation. (Ex.1/23). She does not recall what if anything she said to the officers. (Ex. 1/23). This was the only time anyone associated with CFISD spoke with Jane about the assault that occurred on the Cypress Creek campus. (Ex.1/23).

A medical examination two days later revealed additional injuries. Jane underwent a second surgery and remained hospitalized for nearly a week. (Ex.1/25, 26)(Ex.2/3) Jane spent her 15th birthday in the hospital. (Ex.1/26) Jane's surgeries were followed by weeks of outpatient wound care. (Ex.1/27)(Ex.2/22). After several weeks of healing, Jane underwent a procedure to terminate the pregnancy. (Ex.1/28).

### CFISD's Response to Jane's Report of Sexual Assault

Jane's mother notified Cypress Creek Assistant Principal Carol Gibson of the assault the morning after it occurred. (Ex.2/26). Jane's mother described what Doe had done and said that Jane had not wanted that, Gibson responded in agreement, "Who would agree to that?"(Ex.2/26) Jane's mother recalls Gibson making a comment like "that is something a porn star would do." (Ex. 2/26). Jane's grandmother also spoke with Gibson briefly that day and told her how serious Jane's injuries were.(Ex.3/11)

Several days after the assault Jane's mother and grandfather went to Cypress Creek to see Gibson. (Ex.2/28)(Ex.4/12). During the meeting, Jane's mother asked if there was video of the stairwell and requested to see it. (Ex.2/28). Jane's mother made it clear that Madison was severely injured and was adamant that she did not say or in any way imply that Jane consented or agreed to such a violent sexual act. (Ex.2/28) Jane's mother further made it clear that she intended to pursue criminal charges and that both she and Jane considered this an assault. (Ex.2/28) Gibson focused on the fact that Jane went willingly into stairwell and told Jane's mother and grandfather, "If we punish him, we have to punish her." (Ex.2/28)(Ex.4/13). Gibson did not ask Jane's mother any questions and she did not indicate that there would be any further investigation. (Ex.2/28)(Ex. 4/13). Within days of the incident and without ever having spoken to Jane, Gibson concluded that this was merely a consensual sexual act that had gone too far. (Ex. 22) Gibson did not speak to CFISD police officers regarding their initial report before concluding her investigation; in fact, she waited several weeks. (Ex.7/57:21-58:19, 62:12-25) She did not see the CFISD police report until her deposition in September 2019. (Ex.7/61:8-15).)[2] Gibson relied only "on the statements [she[ had" in reaching her conclusion "early on" that it was consensual act.  (Ex. 7/58:24-59:3).

No one ever made Jane or Jane's mother aware of CFISD's policies or complaint procedures. (Ex.2/29). Gibson did not ask Jane or Jane's mother to reduce the complaint about the assault to writing. (Ex.2/29). Gibson did not ask Jane's mother for a written statement nor did she ask Jane's mother to obtain a written statement from Jane. (Ex.2/29). Neither Jane nor her mother were ever provided a written report of any findings.  (Ex.2/29). Neither Jane nor her mother were ever notified that of the right to file a complaint or grievance or an appeal of Gibson's decision. (Ex.2/29). Neither

---

[2] The court should disregard the Harris County Sheriff's Office records. By her own admission, Gibson did not rely on these records and they have absolutely no relevance in this case. The focus must remain on the District's actions.

Jane nor her mother were ever notified that they had a right to file a complaint with the U.S. Department of Education's Office for Civil Rights. (Ex.2/29).

## CFISD Police Department

CFISD Police Department's only involvement was to respond to the call on the night of March 10, 2014, take the initial report and pass it along to the Harris County Sheriff's Office. (Ex. 9/40:8-24) CFISD PD did not investigate. (Ex.9/40:8-24) CFISD PD never obtained the SANE records. (Ex. 9/ CFISD PD did not communicate with Cypress Creek administrators about this incident regarding the initial report nor did the police officers share its report with them. (Ex.9/42:14-20)(Ex.11/39:9-11). CFISD PD did not follow up with HCSO. (Ex.9/42:14-20)

## The Impact on Jane's Education

After the assault, CFISD offered no accommodations to Jane and took no measures to protect her from further harassment and retaliation. Jane's mother sought assistance from Jane's counselor Daedrine Rhodes but was told that the school "does not do that." (Ex.2/34) Rhodes did not offer any outside resources or suggestions. (Ex. 2/34). Roe missed days of instruction and struggled academically. Although one school record reflects that she was designated as "homebound," she did not receive any homebound instruction. (Ex. 2/35)(Ex.3/16-18)(Ex.20 CFISD ROE 001076). Roe failed multiple classes in the spring semester of 2014, including English and Biology. (Ex. 2/36)(Ex. 20)

When Jane returned to Cypress Creek for the 2014-2015 school year, Doe remained at school with free and uninhibited access to her. Doe's friends harassed Jane, both in person at school and online through social media. (Ex.1/30). They accused her of falsely claiming Doe raped her and trying to get him arrested. (Ex.1/30) Doe had informed his friends of Jane's pregnancy, leading to them call her offensive and emotionally charged names including "baby killer."(Ex. 1/33.)

Roe's English teacher accusingly told her she had failed English the prior year (the year of the

assault) due to "being a drop out." (Ex. 5/105:8-106:4) Roe was unable to play volleyball and softball because of her grades. (Ex.3/19).

In February 2015, Jane withdrew briefly for about a week, with plans to move to Indiana to live with her father and get away from Cypress Creek High School and Doe. (Ex. 1/32)(Ex.2/38). The plans did not work out  so Jane had no choice but to re-enroll at Cypress Creek. (Ex.1/32)(Ex.38).

On June 30, 2015, after enduring an increasingly hostile environment at Cypress Creek for an entire school year, Roe intentionally overdosed on Benadryl as she was being harassed by fellow CFISD students on the social media application, Instagram. (Ex.1/33). The unrelenting harassment related to the sexual assault had escalated to include posts calling her a "baby killer," tagging her in photos of a dead fetus and encouraging Jane to kill herself. (Ex.1/33).

Due to the ongoing hostile environment at Cypress Creek, Jane withdrew from CFISD and enrolled in school in Indiana where her father lived for the 2015-2016 school year. (Ex.1/34) However, Jane wanted to return to Houston to live with her grandparents, her mother and her younger siblings so she attempted to return to Cypress Creek in March 2016, the spring of her junior year. (Ex. 1/34).(Ex.2/42).

Jane's mother spoke with Cypress Creek counselor Karen Clarkson in her office at least three times. (Ex.2/41) She discussed the March 10, 2014 assault and some of the new incidents of harassment Jane was experiencing. (Ex.2/41) The last time was when Jane re enrolled in the spring of 2016 after having been enrolled in school in Indiana where her father lived. (Ex.2/41). Jane's mother brought up the March 10, 2014 assault again and the harassment that followed. (Ex.2/41) She reminded Clarkson that nothing had been done and Doe was still on campus. (Ex.2/41) She asked Clarkson to try to make sure that in scheduling Jane's classes that they would not cross paths. (Ex..2/41) Clarkson said she would do what she could but again said there was nothing they could do about the past. .(Ex.2/41).

When Jane returned in March 2016, Doe was still a student at Cypress Creek, as were the other students who harassed her throughout the 2014-2015 school year following the sexual assault.(Ex.1/34) After only a few weeks, Roe was overwhelmed and unable to continue attending school. (Ex. 34). When Roe's mother met with school personnel to discuss her concerns about Roe, school personnel made no effort to investigate or otherwise address her concerns nor did they provide or offer to provide any support services to Roe. (Ex.2/42). Instead, Roe's mother was encouraged to simply withdraw her daughter and to designate on the withdrawal form that Roe was going to be "home schooled" to protect herself from truancy charges. (Ex.2/42).

On April 13, 2016, at barely 17 years old, Roe withdrew from high school during her junior year. She never returned to Cypress Creek high school – or any other high school. (Ex.1/35).

## ARGUMENT & AUTHORITIES

## TITLE IX

Title IX of the Education Amendments of 1972 ("Title IX") prohibits discrimination on the basis of sex in all federally-funded educational programs:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. §1681(a). Title IX is enforceable through an individual's private right of action and allows for the recovery of damages. *Davis v. Monroe Cty. Bd. Educ.,* 526 U.S. 629, 639 (1999)(citing *Cannon v. Univ. Chic.*, 441 U.S. 677, 804 (1979) and *Franklin v. Gwinnett Cty. Public Schs.*, 503 U.S. 60 (1992)).  The recognition of this private right of action has given rise to two general avenues for Title IX claims— one for claims based on an official policy of discrimination and another for claims based on an institution's actual notice of and deliberate indifference to sexual harassment or assault. *Karasak v. Regents of the Univ. of Cal.*, 948 F.3d 1150 (9th Cir. 2020); *Doe 1-10 v. Baylor Univ.,* 240 F.Supp.3d 646,

657 (W.D. Tex. 2017). Courts recognize claims for "heightened risk" based both on an official policy of discrimination and "pre-assault" deliberate indifference. *See Hernandez v. Baylor Univ.*, 274 F.Supp.3d 602, 614, n.4. (W.D. Tex. 2017).  Here, the summary judgment evidence supports Jane's official policy and pre-assault heightened risk claims and her post-assault claims.

I.      **The Evidence in This Case Supports Jane Roe's Claims for Heightened Risk Based on Both an Official Policy of Discrimination and *Pre-Assault* Deliberate Indifference**.

Defendant largely ignores Jane's heightened risk claims, devoting only two paragraphs on the final page of its Motion to argue that her claims must fail as a matter of law.  Relying primarily on authority from a Kansas District Courts, Defendant seems to argue that the heightened risk analysis only applies to "specific programs" that "encourage" sex-based discrimination or harassment. In an attempt to avoid scrutiny of  its policy of indifference to dating violence and sexual assault, summarily dismisses Plaintiff's claims with the statement that "[t]his case does not involve the sort of systemic problems discussed in the football program cases that would have placed the District on notice that there was a significant risk of sexual assault or harassment." (Motion at 25, Dkt. 33). Defendant misapprehends Jane's pre-assault claims and misconstrues the established Title IX framework for heightened risk clams. This Court must not be misled.

A.      *CFISD policies, practices and failure to train staff and students created a heightened risk that Jane would be a victim of teen dating violence and suffer a sexual assault on campus.*

The Supreme Court has repeatedly explained that where the Title IX violation in question is caused by an institution's discriminatory policy or custom, courts need not apply the notice and deliberate indifference framework typically used in cases involving institutional liability for sexual harassment or assault. *See Gebser  v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 290 (stating that the actual notice and deliberate indifference requirements are restricted to those cases "that do not involve [an]

official policy of the [funding recipient]"); *Davis,* 526 U.S. at 642 (acknowledging that the notice "limitation…is not a bar to liability where the funding recipient intentionally violates the statute.")

"[T]he calculus shifts when a plaintiff alleges that a school's 'official policy' violates Title IX." *Karasak v. Regents of the Univ. of Cal.*, 948 F.3d 1150 (9th Cir. 2020). In that context, the school has "intentionally violate[d] the statute." *Id.* (quoting Davis, 526 U.S. at 642). A school need not have had actual knowledge of a specific instance of sexual misconduct or responded with deliberate indifference to that misconduct before damages liability may attach. *Id.; see also Mansourian v. Regents of Univ. of Cal.,* 602 F.3d 957, 967 (9th Cir. 2010) ("[W]here the official policy is one of deliberate indifference to a known overall risk of sexual harassment, notice of a particular harassment situation and an opportunity to cure it are not predicates for liability.")

Citing *Hernandez v. Baylor Univ.* in an attempt to limit the application of the heightened risk analysis to "football program cases," Defendant conspicuously ignores *Does 12-15, et al v. Baylor Univ.,* 336 F. Supp. 3d 763 (W.D. Tex. 2018) and *Does 1-10 v. Baylor Univ.,* 240 F.Supp.3d 646 (W.D. Tex. 2017). These two cases against Baylor University did not involve the football program; rather, the *Doe* plaintiffs alleged that Baylor knew of and permitted a "**campus** condition rife with sexual assault," that Baylor mishandled and discouraged reports of sexual assault, and that Baylor's response to these circumstances "substantially increased" the risk that they and others would be injured.. *Does 12-15*, 336 F.3d at 779. *Does 1-10*, 240 F.3d at 661. The *Baylor* Court found that the plaintiffs' "heightened risk claims fit squarely within the official-policy rubric…." *Does 12-15*, 336 F.3d at 779; *Does 1-10*, 240 F.3d at 661. Relying on the *Baylor* Court's analysis in the *Doe* cases, courts – including courts in the Fifth Circuit – have recognized the viability of official policy heightened risk claims in contexts outside a football program. *See Gruver v. Louisiana*, 401 F.Supp.3d 742, 762 (E.D. La. 2019)( Greek hazing;) *Harvey v. Carthage Indep. Sch. Dist*, No. 2-18-CV-00164-JRG, 2019 U.S. Dist. LEXIS 36261, 2019 WL

1083782 (E.D. Tex. Mar. 7, 2019)(recording and dissemination of video of high school student undressing).

Contrary to Defendant's assertion, courts do not limit the heightened risk analysis to allegations of a "specific problem in a specific program." *See Karasek*, 948 F.3d at 1169. Rather, "[a] funding recipient can be said to have intentionally acted in clear violation of Title IX when the violation is caused by official policy, <u>which may be a policy of deliberate indifference to providing</u> <u>adequate training or guidance that is obviously necessary for implementation of a specific program **or**</u> <u>policy of the recipient</u>." *Simpson v. Univ. of Colorado Boulder*, 500 F.3d 1170, (10th Cir. 2007)(citing *Davis*). "Implementation of an official policy can certainly be a circumstance in which the recipient exercises significant control over the harasser and the environment in which the harassment occurs. *Id.* (internal quotations omitted)."

Similarly, courts do not, as Defendant maintain, require that a policy "*encourage*" sex-based discrimination or harassment. Quoting *C.T v. Liberal Sch. Dist.*, 562 F.Supp.2d 1324,1339 (D. Kan. 2008), Defendant  ignores developments in the caselaw that undermine such narrow application of the theory advanced by the Tenth Circuit in *Simpson*. For example, the court in *Doe v. Emerson College*, 271 F. Supp. 3d 337 (D.Mass. 2017), considered a Title IX policy claim based failure-to-train. The court cited *C.T.*, but went on to analyze not whether the program at issue "encouraged" harassment, but rather whether a "reasonable juror could conclude . . . that any inadequacies in training were so deficient that they constituted 'encouragement of the [harassing] conduct,' *or otherwise amounted to deliberate indifference." Id.* (alteration in original) (emphasis added) (quoting *Simpson,* 500 F.3d at 1177). *See also*, *Prasad v. George Washington Univ.*, 325 F.R.D. 1, 9 (D.D.C. 2018). (noting that courts now "clearly recognize[] that encouragement of harassing conduct is not the only way to show deliberate indifference." )"The Department of Education has made it clear to school administrators that training and proper responses to sexual assault claims are required. Just like failing to train a police officer on

when to use his or her gun, failing to train a school principal on how to investigate sexual assault allegations constitutes deliberate indifference." *Doe v. Forest Hills Sch. Dist.*, No. 1:13-CV-428, 2015 U.S. LEXIS 175321, 2015 WL 9906260, at *17 (W.D. Mich. Mar. 31, 2015).

CFISD is the third largest school district in Texas with 91 campuses and more than 117,000 students (CFISD Ex.1). The District has adopted policies prohibiting sex-based discrimination and harassment against students, including dating violence. (CFISD Ex.1-A). CCISD's Board Policy FFH(LOCAL) defines prohibited discrimination harassment, dating violence and retaliation and outlines reporting and investigative procedures. (CFISD Ex.1). The policy reflects the District's designation of a Title IX Coordinator – the person to whom reports of discrimination based on sex may be made and who is responsible for coordinating the District's efforts to comply with Title IX. (Ex. 25 FFH(LOCAL)). The District's Title IX Coordinator is Assistant Superintendent for Human Resources and Student Services, Deborah Stewart. (Ex. 25 FFH(LOCAL)). Despite this "paper policy," CFISD has made no meaningful effort to comply with Title IX.

**1. "What is Title IX?"**

The best evidence of CFISD's obvious failure to provide training comes from the District witnesses' responses to the question, "What is Title IX?" Cypress Creek counselor Karen Clarkson answered: "It's a law. It's a legal law protecting the safety of students."(Ex. 14/45:13-24). Daedriane Rhodes, Jane's counselor at the time of the assault, answered: "I am not familiar." (Ex.13/21:14-15). None of the four CFISD police officers who involvement with Jane's report, including the officer who responded to the hospital were aware of Title IX or how it impacted their duties as campus police.(Ex.9/16:21-22)(Ex.10/18:12-15)(Ex.11/17:21-18/17)(Ex.12/11:5-6). Even the administrators identified as designees to conduct investigations under FFH(LOCAL) did not have an understanding of their duties under Title IX. (Ex. 8/59:19-60:9). Most disturbing, and perhaps most revealing, is Cypress Creek Assistant Principal Carol Gibson's response:

> "Title IX is – my understanding is that it's to ensure equality on both parts, female and male, looking at – I'll use – I guess on making sure that in cases of sexual abuse, sexual assault, sexual harassment, that there is an equality of – that we are looking at all sides, and – of it."

(Ex.7/82:18-83:15) Gibson could not identify the District's Title IX Coordinator but testified that she believed that the role of the coordinator was to act as a final decision maker in the appeals process. (Ex.7/83:2-84:5).

Deborah Stewart, the named Title IX Coordinator, fared little better. She described her role as the coordinator to include "supporting principals and assistant principals who have the responsibility of investigating allegations from inappropriate comments through drugs on campus. Just student to student infractions." (Ex. 15/16:11-24) Stewart testified she understood that Title IX covered sexual harassment but not sexual abuse. (Ex.15/16:25-17:15) She believed that dating violence was under a different policy but "possibly" could be covered by Title IX.(Ex. 15/16-21). Stewart further testified that administrators receiving a report under Title IX need not notify her as the Title IX Coordinator unless the issue was not resolved at the campus or intermediate administrative level. (Ex.22/20-23:12, 28:12-21). After testifying that she was aware of teacher-student inappropriate relationships at the rate of "one a year at least," Stewart testified that she did not know whether these relationships fell under Title IX. (Ex. 15/55:7-20) In short, Stewart demonstrated a fundamental lack of understanding of Title IX and the significance of her role as Title IX Coordinator.[3]

## 2. Dating Violence Policy Implementation

Despite the state mandate to provide training for teachers and administrators and awareness education for students and parents regarding dating violence, CFISD did nothing. Cypress Creek administrators admit that no training or education regarding dating violence was provided to students

---

[3] Stewart denied that she was designated as the Title IX Coordinator for employees. (Ex.7/1-5) She is. (Ex.25)

or staff. (Ex. 7/99:1-14)(Ex. 8/71:21-72/1). Cypress Creek Counselor Karen Clarkson, who recalled having students "every year" report dating violence, testified that she did not believe that dating violence was a violation of the Student Code of Conduct. (Ex. 14/48:16-47:6, 50:1-17).

The Student Handbook contains no reference to dating violence. (Ex. 71/12-15). Dating violence is not referenced in the Student Code of Conduct. (Ex.8/81:19-21) In fact, according to Gibson, other than being defined in CFISD Board Policy FFH(LOCAL), dating violence was not addressed in any publications provided to students in 2013-2014. (Ex.7/99/1-8). Seven years after the mandate and despite being provided a road map and a tool kit from the Texas School Safety Center to ensure successful implementation of FFH(LOCAL), CFISD intentionally did nothing. The CFISD Board of Trustees approved the dating violence policy but the District never took a single step toward implementing it.

### 3.  No Discipline = No Report

CFISD is engaged in a record-keeping practice designed to minimize the number of reports of sexual harassment and assault, conceal from the public the extent of the problem on its campuses and avoid accountability. The District's reasoning seems to be that if no formal disciplinary action is taken as a result of a report of sexual harassment or sexual assault, then no report is recorded and the Title IX Coordinator need not be notified. (Ex. 15/50:2-52/16) In response to a question about the reports she recalled receiving during the 2012-2013 school year, Title IX Coordinator Deborah Stewart explained: "I would have reviewed the yearly, the year end report, of our overall discipline data, but I do not recall he specifics." (Ex.15/50:2-9) She admitted that because she only looked at discipline data, if the reports did not result in discipline, she might never know about them. (Ex.15/50:10-17). Stewart further acknowledged that there is no discipline code for dating violence and it is therefore impossible to glean from the District's data reported to the Texas Education Agency whether an incident

of dating violence had occurred. (Ex.50:15-52:16). Likewise, sexual harassment is encompassed in broader category that includes non-sexual physical contact such as students pushing each other in the hallway; therefore, without reviewing every action coded as "inappropriate contact with peer" and reading the description of the conduct, it is impossible to determine whether the action involved sexual harassment. (Ex.2/51:20-52:16). Not surprisingly, given this construct, CFISD responded to Plaintiff's discovery requests for information related to reports of dating violence, sexual harassment and sexual assault with extraordinarily low numbers for a district of more than 100,000 students. (Ex. 23 CFISD-ROE 001208). The District responded that it does "not have **_any_** incidents **_documented_** as dating violence, sexual assault or sexual harassment for Cy Creek." (Ex. 23 CFISD-ROE 001208)(emphasis added). And, according to CFISD, only **_one_** sexual assault was reported District-wide in the five-year period from 2012 through 2017. ((Ex. 23 CFISD-ROE 001208).

    **B.  CFISD acted with deliberate indifference to the known risk of dating violence and sexual assault on its campuses, specifically Cypress Creek High School.**

    CFISD seeks to impose an artificial barrier around known risks related to widespread misbehavior in favor of a rule that only imposes Title IX liability if a school was aware of a particular problem student or student group likely to commit harassment or a particular student who was especially at risk of being targeted. Nothing in the logic of Title IX or the caselaw construing it supports such a rule.

    The Title IX standard recognized by the Supreme Court and Fifth Circuit requires analysis of whether a school district's response is "clearly unreasonable response in light of the *known circumstances*." *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.,* 647 F.3d 156, 168 (5th Cir. 2011) (quoting *Davis v, Monroe Cty Bd. of Educ.*, 526 U.S. 629 (1999) (emphasis added). There is no basis for excluding from the "known circumstances" a school district's knowledge that a problem is widespread and recurring throughout its student population. "Nor is there any reason to assume that Title IX

categorically permits a school district to turn a blind eye to the group dynamics in which harassment sometimes thrives." *T.C. ex rel S.C .v. Metro Gov't of Nashville & Davidson Cty.,* 378 F.Supp.3d 651, -- (M.D. Tenn. 2019), vacated on other grounds and remanded*, In re Metro Gov't of Nashville & Davidson Cty,* No. 19-0508, 2020 U.S. App. LEXIS 2331 (6th Cir. January 24, 2020).

Title IX requires only that the school have "enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based." *Id.* (internal quotations omitted). Actual knowledge of a serious, widespread problem is at least enough to allow a district to reasonably respond in some way, even if it cannot predict or prevent every future incident. *Id.*

### 1.   District-Wide Sexual Misconduct

Here, official discipline data portrays CFISD as an enclave of safety free from dating violence and sexual misconduct. The facts obscured by the data reveal otherwise. Although CFISD's discovery responses indicate that there were no incidents recorded as dating violence, sexual harassment, or sexual assault at Cypress Creek High School for the school years 2012-13 through 2016-17, Assistant Principal Carol Gibson and CFISD police officers recall otherwise.

Gibson testified she remembered investigating at least <u>four</u> incidents while she was at Cypress Creek in  2012-13 and 2013-14. (Ex.7/90:8-92/23). The incidents involved students in current or former dating relationships and included claims of "inappropriate touching" of "the breasts and butt" as well as "grabbing and confining to areas." (Ex.7/90:8-92/23). CFISD Police Officer Cedric Nolly recalled that another female student – in addition to Jane – reported that she was sexually assaulted on the Cypress Creek campus in 2013-14. (Ex. 10/25:15-28:2). In addition to having students report dating violence "every year," Cypress Creek Counselor Karen Clarkson recalled a student reported an off-campus sexual assault during the 2014-15 school year. (Ex. 14/48:16-47:6; 52:1-53:4). CFISD Police Officers testified they were aware of reports of student-on- student sexual assault and, although

some could not identify on which campuses the assaults occurred, one estimated there to be "two a year" District-wide. (Ex.12/11:20-12:15)(Ex. 11/25:2-14).

### 2.  Sex in the Stairwells

Sex in the stairwells of Cypress Creek High School was so common that it has become the school's stereotype among students – so much so that it made it onto a local comedian's Instagram account. (Ex.1/12,13-A). CFISD Police Officers and Cypress Creek staff are in on the joke too, acknowledging sexual activity in the stairwells is both common and overlooked. (Ex.9/20:1-6)(Ex.11/47:16-48:23)(Ex.14/14:14-19) In fact, Cypress Creek Counselor Karen Clarkson testified that it was the mention of the stairwell that triggered her memory of the incident. When asked what stood out in her mind that caused her to remember Jane, Clarkson testified: "Just that one of the counselors said *we had another* – and I am not quoting her, okay, this is just from my memory, that there were a *couple of kids caught in the stairwell having sex.*" (Ex. 14/1-6). Clarkson went on to testify that it was actually Doe's name that came up in the initial conversation about sexual activity in the stairwell. (Ex. 14/15:12-23). Doe, she testified, was a "frequent flyer in the AP's office, and so everybody knew [Doe]." (Ex.14/24:4-24). Doe was known for "being in the hallway when he's not supposed to be." (Ex. 14/24:4-24)

Based on this cumulative evidence, a reasonable jury could find that CFISD's actions created a heightened risk that Jane's injuries would occur.

### II.  Jane's *Post-Assault* CFISD's Response to Jane's Report of Sexual Assault was Clearly Unreasonable

Liability for student-on-student harassment under Title IX requires the claimant to prove each of five elements. Therefore, to prevail on summary judgment for a claim of student-on-student harassment, a defendant school district, as the moving party, must demonstrate that there is no genuine dispute as to any one of the following material facts: "(1) [The district] had actual knowledge of the harassment, (2) the harasser was under the district's control, (3) the harassment was based on

the victim's sex, (4) the harassment was so severe, pervasive, and objectively offensive that it effectively bar[red] the victim's access to an educational opportunity or benefit, and (5) the district was deliberately indifferent to the harassment." *I.F. v. Lewisville Indep. Sch. Dist.*, 689 F.3d 360, 369 (5th Cir. 2019)(quoting *Sanches c. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011). Here, Defendant moves for summary judgment on Roe's post-assault Title IX claim based only on the fifth element: deliberate indifference.

A school district is "deliberately indifferent" when its response to student on student harassment is "clearly unreasonable under the known circumstances." *Davis*, 526 U.S. at 649. Roe acknowledges the Fifth Circuit's observations that "the strict nature of the deliberate indifference standard and the considerable flexibility school districts exercise in responding to harassment counsel that "Title IX does not require flawless investigations or perfect solutions." *I.F.* 689 F.3d at 369. Roe does not demand perfection. She does, however, seek to hold the District responsible for actions that are far more than merely "inept, erroneous, ineffective or negligent." *See Id.*

Defendant repeats the refrain that it cannot be liable for "negligent delays," "botched investigations," or "erroneous conclusions" and reminds the Court that this is true "even if the District fails to follow its own policies its own policies in connection with its investigation." (Motion at 22, Dkt. 33). However, as a trio of recent Southern District of Texas cases demonstrate, summary judgment is not always a given and school districts do not always get a free pass.

In *J.B. v. Klein Indep. Sch. Dist.*, No. 4:19-CV-0210, 2020 U.S. Dist. LEXIS 26737 (S.D. Tex. Feb. 18, 2020), the school district moved for summary judgment disposing of the plaintiff's Title IX claims alleging harassment during both elementary and middle school. *Id.* at *6-7. The court concluded that summary judgment was appropriate on the elementary school claims but reached a different conclusion with regard to the middle school claims. Faced with conflicting testimony, the court noted that "[t]he absence of documented reports of sexual harassment …is not conclusive evidence that [the

plaintiff] never complained about sexual harassment, particularly given her deposition testimony that she complained repeatedly to 'all the teachers she could find.'" *Id.* at *27. The court reasoned:

> "The school district contends the lack of investigation or disciplinary actions resulted from its lack of actual knowledge, while [the plaintiffs] contend the absence of action evidences deliberate indifference. Whether the school district was deliberately indifferent will hinge on whether the jury finds [the plaintiff's] testimony regarding her daily complaints to be credible – a determination this Court cannot make."

*Id.* at 28. *See also, Doe v. Katy Indep. Sch. Dist.*, No. H-17-1060, 2019 U.S. LEXIS 214831, 2019 WL 6830792 (S.D. Tex. Dec. 13, 2019)(finding factual disputes as to deliberate indifference precluded summary judgment where the school district denied having knowledge of prior reports of an inappropriate teacher-student relationship). *Cf. Ruvalcaba v. Angleton Indep. Sch. Dist.,* No. 3:18-CV-00243, 2019 U.S. Dist. LEXIS 229466 (S.D. Tex. Dec. 19, 2019)(granting summary judgment where district conducted a thorough investigation and "sought to uncover all information that would shed light on whether a sexual assault had taken place" and "a lengthy report…detailed who AISD interview, what information AISD gathered and why AISD concluded no sexual assault occurred.").

## A. The Facts Surrounding the District's Investigation (or lack thereof) are Substantially Disputed.

Here, there is no dispute that Cypress Creek Assistant Principal Carol Gibson was the District's "designee" for purposes of conducting an investigation into Jane's complaint of sexual assault. There is dispute, however, regarding every other material fact related to the investigation. In fact, conflicts between the District's Answers to Interrogatories, Gibson's deposition testimony, Assistant Principal Rashad Godbolt's deposition testimony and former Director of Student Services David Garcia reveal critical credibility issues that can only be resolved by the jury.

Conflicts arise at each stage of the investigation. CFISD's Answers to Interrogatories reflect the following:

- Gibson investigated by speaking with both students.

23

- Gibson spoke with both Jane and her mother when they came up to the school to talk with her.
- "[Jane] was also questioned by Carol Gibson when [Jane] and her mother came up to school to talk to her."
- "Ms. Gibson did not take any notes or prepare any memoranda regarding this matter."

(Ex.22) Gibson acknowledged in her deposition that she had spoken with CFISD General Counsel Marney Sims, who verified the Answers on behalf of the District, to provide information for the Answers. (Ex. 7/20:1-21:2) She testified that she had not reviewed anything "written" until meeting with counsel to prepare for her deposition. (Ex. 7/20:1-21:2).

In an about face, Gibson testified in her deposition and CFISD argues in its Motion that although Gibson did not speak to Jane:

- she reduced the complaint to writing
- took notes
- obtained a written statement from Jane,
- drafted a written conclusion and
- maintained a file that was forwarded to Director of Student Services David Garcia

(Ex. 7/34:2-37:2; 59:18-60:5;88:4-90:7;102:16-103:10)

David Garcia denies any knowledge of Jane or her complaint and testified that he did not maintain files related to investigations. (Ex.16/23:4-7; 25:11-26:21). The District ignores the conflict between its Answers to Interrogatories and its administrators' testimony and attempts to explain the absence of the written documentation Gibson claims she made by citing a document retention schedule. (CFISD Ex.1/14-16-N). An excuse does resolve a conflict.

**B. CFISD Seeks to Distract the Court with Irrelevant and Undisclosed Evidence**

The District attempts to gloss over another failure to timely produce records, this time without explanation, by sliding a campus video that was not produced in discovery in with other so-called "business records." (CFISD  Ex.1-K). The District's reliance on this video is problematic for several reasons. First, CFISD did not produce the video with its disclosures or its responses to Plaintiff's

Requests for Production. Plaintiff deposed both Gibson and Godbolt - the administrators who claimed to have retrieved and viewed video – in September 2019. CFISD did not produce the video. Plaintiff deposed the CFISD police officer who independently retrieved video. CFISD did not produce the video. The sudden appearance of a video at summary judgment is troubling – particularly in light of records found and not found.  But, perhaps more important now, is the District's misleading reliance on the video to support the reasonableness of Gibson's investigation. Both Godbolt and CFISD  Police Officer Patrick Arnett testified that the only video available showed Jane and Doe walking in the crowded hallway with other students at the 2:30 p.m. dismissal time– not after tutorials – and that the video was therefore irrelevant.  (Ex. 8/29:13-22)(Ex. 11/36:4-37:17, 43:6-14). Gibson, in contrast, claimed she viewed video <u>with Godbolt</u> that showed Jane and Doe <u>after tutorials</u> entering and leaving the stairwell. She maintained her conclusions were based in large part on this video. (Ex.7/40:18-41:25). The video that has now surfaced is not that video.

CFISD's attempts to deflect and distort the evidence speaks volumes and further demonstrates the District's deliberate indifference to its duties under Title IX, the investigative process, and to Jane. After weighing the credibility of the witnesses, including Jane and her mother, a reasonable  jury could find that the District's actions were clearly unreasonable. Summary judgment should be denied.

<u>**CONCLUSION & PRAYER**</u>

For these reasons, Plaintiff Jane Roe respectfully requests the Court deny Defendant CFISD's Motion for Summary Judgment and allow her Title IX claims to proceed to trial.

Dated:  June 5, 2020                                    Respectfully submitted,

                                                             */s/ Sheila P. Haddock*
                                                             Sheila P. Haddock
                                                             Attorney-in-charge
                                                             (Texas SBN # 00790810)
                                                             (Southern Dist. of Texas # 256441)
                                                             Sheila@zalkin.com

Alexander S. Zalkin (*pro hac vice pending*)
alex@zalkin.com
Irwin M. Zalkin (*pro hac vice pending*)
irwin@zalkin.com
THE ZALKIN LAW FIRM, P.C.
10590 W. Ocean Air Drive, Ste. 125
San Diego CA  92130
Telephone: (858) 259-3011
Facsimile: (858) 259-3015

*Attorneys for Plaintiff Jane Roe*


## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2020, I electronically filed the foregoing paper with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record in this matter.

THE ZALKIN LAW FIRM, P.C.

*/s/ Sheila P. Haddock*
Sheila P. Haddock
Attorney-in-charge
(Texas SBN # 00790810)
(Southern Dist. of Texas # 256441)
Sheila@zalkin.com
THE ZALKIN LAW FIRM, P.C.
10590 W. Ocean Air Drive, Ste. 125
San Diego CA  92130
Telephone: (858) 259-3011
Facsimile: (858) 259-3015

Dated: June 5, 2020